We'll call the next case of Narendra Singh versus the Attorney General of the United States. Mr. Mundy. Good morning, your honors. May it please the court, my name is Nicholas Mundy. I'm attorney for the petitioner, Narendra Singh, and I respectfully request a three-minute time for rebuttal. That request will be granted. Thank you, your honors. The primary issue in this case is essentially whether or not the seven-year clock required for cancellation or removal under INA Section 240AA can be restarted despite the stop-time rule under INA Section 240AD1, which has two distinct triggering elements that stop that seven-year continuous physical presence. Sure. And we're familiar with that. Can you go directly to the question that's put in play by the briefing here, and that is, you know, which authority is going to control? We've got some conflicting or at least some tension within the authorities coming out of the BIA and from our own court. You can pin your hopes on Okiki, but by its terms, as our Nelson opinion points out, Okiki did not address the circumstance that we've got here where the alien is removed on the basis of a crime. I mean, Judge Garth's opinion, the opinion for the court in Okiki, specifically says I'm not talking about that. This is a different set of circumstances. So since Okiki doesn't deal with that expressly, and Nelson does expressly deal with it, aren't we bound by the Nelson opinion? And isn't your client just out of the box right there? No, I don't think so, Your Honor, because in Okiki, the court specifically arrested the most important fact on the lawful entry and admission of Okiki, declining to discuss whether or not the clock would have restarted if he had been charged in the notice to appear with the crime. In Nelson, even though Nelson was charged in the notice to appear with the crime, there are tremendous, significant distinguishing factors. This is from Okiki, page 590. Quote, this case is not about deporting an alien who had committed a crime. In Okiki, the notice to appear is specifically directed to overstaying the visa. It doesn't mention the criminal activity. And Judge Garth goes out of his way to say this case is not about deporting an alien who had committed a crime. Nelson is a case about deporting an alien who had committed a crime, and the court distinguishes Okiki expressly on that basis. This is a case about an alien who is to be deported, or that's the fundamental question, right, for committing a counterfeiting crime. So, crime of moral turpitude. Why is, how do you get out from under Nelson when Okiki specifically says, I'm not talking about that. Nelson comes along and says, well, we are talking about that. Because there are two distinct triggering events. One of which is the service of the notice to appear. One of which is the commission of a crime involving moral turpitude. Okiki did not address that issue solely because he wasn't charged with that under the notice to appear. He easily could have been. And in fact, I think it's even mentioned in the decision that he could have been. So it was not before the court at that time. Well, right. Precisely. That's the point I'm trying to get you to respond to. Okiki doesn't speak to the circumstance that your client is in. Because your client, different than Mr. Okiki, has a notice to appear which expressly pins its deportation or its removal basis to the criminal activity. That is the Nelson case, isn't it? Well, I think that those are the facts of the Nelson case. In essence, Nelson did commit a crime and he was thereafter rearrested in 2008 and charged in the notice to appear for having committed the original crime back in, I believe it was 2000. Okiki also had committed a crime. And it just wasn't listed in the notice to appear. So as for Nelson, even though the notice to appear, the facts of that case, are such that yes, he was charged in the notice to appear, but I don't think that makes this positive. I don't think that is the key issue here. Well, you're making what might be a sound policy argument, but I'm just trying to figure out what we're bound by and what we're not bound by. Would you agree that Okiki distinguishes, it actually makes the point, instead of saying this, it actually makes the point that it is not speaking to the circumstance your client finds himself in? Well, yes and no. The reason, Judge, is because the circumstance that my client finds himself in is there was an event, one of the two, that the government claims triggered the stop time rule. The fact that in Okiki it was the issuance of the notice to appear and in Nelson it was the crime itself, to me, I don't think that that is a primary and paramount distinction because it's analyzing the same stop time rule under the same provision of law. But aren't you forced to agree that Nelson is closer to your case than Okiki? Absolutely not, Judge. I don't see how you can say that when both cases involve individuals who were charged with crimes and notices to appear. If I may address that, Judge, in Nelson, I don't necessarily think that Nelson is bad law, that the reasoning isn't sound.  The entry procedures to enter the United States through Canada are very, very different than they are for going to other countries, such as the petitioner in this case. The petitioner in this case traveled four times to India, entering each time as a local permanent resident through Newark International Airport. The first such travel was while he was still under federal probation for the crime, with the acquiescence and consent of federal probation. He also, he lived his life openly and notoriously, exercising his rights. He worked here, he paid his taxes, he filed for citizenship, he filed for naturalization, he petitioned for his wife and child to come from India as local permanent residents during this time frame, between 2003, when he left with the consent of probation and returned, and 2010, when he was placed in removal proceedings. All of these things that he did were completely different than what Nelson did. Nelson committed a subsequent crime in 2008. That is how he was brought to the attention of the Department of Homeland Security. The petitioner in this case did nothing of the sort. He lived an incident-free lifestyle from the crime in 2000 until he was apprehended in 2010. Is there anything in the case law that says that matters? There is nothing in the case law that says that matters. In fact, one of the arguments that we made in the briefs is that Okeke, as far as I can tell, is still valid, although extraordinarily limited and narrow, and Nelson is valid before this court. But I don't think that they're saying two completely different things. I think that there's room for someone to be in the middle. And I think that in this case, the petitioner is much more like Okeke than Nelson. Explain that statement, because I'd be interested to know what's the middle. Because the two cases seem to be, what's the middle? Where do you see a middle ground between Okeke and Nelson? Well, the relief of cancellation of removal is, in and of itself, a discretionary form of relief, as are many forms of relief under the Immigration and Naturalization Act. And I think that the equities and the facts of each individual case need to be determined and assessed. I don't think that there is a blanket prohibition contained in 8 U.S.C. 1229 D.1 that says, one of these two things happens and you are permanently barred from obtaining those seven years. I think the very existence of Okeke acknowledges that fact. And basically what it says is, lightning struck there, but lightning can strike twice. Well, I'll be asking the attorney for the United States this question too, so I'd be interested in your take on it. It looks like Mendoza says, once the stop time rule kicks in, forget it. If you've committed a crime or you get a notice to appear, it doesn't restart. Then you get, and that's in-bank, then you get another in-bank decision in Cisneros from the BIA. And it says, well, Mendoza was speaking to this circumstance where people are delaying, they're playing the clock while they're in their removal proceedings. But if they're not in those, if the removal is associated with a different event, then Mendoza doesn't count. Judge Garth seems to pick up on that and Okeke makes the statement he makes in sending it back. After that, the BIA, it sort of treats Cisneros as a one-off, very limited, don't pay any attention to that. And then we give deference to that. That's how it seems to develop. The BIA's Nelson decision says, Cisneros, subtext, what were we thinking? That's just only for that limited set of facts. Then we give that deference in our Nelson opinion. This kind of up and down is what brings us to the point we're at today. How do we rationalize that? Except to say, well, Nelson is what it is and it binds us. What else do we do with it? Well, Judge, with respect to Mendoza-Cendino, I think that's important to note that the argument there was that the clock just simply automatically restarts once one of these triggering events occurs. And I think that's completely different than what we have here, where we have not only one lawful admission into the United States, but several and many other positive factors in petitioner's favor. In Cisneros-Gonzalez, the court did determine that the clock restarted, but that was for an alien who re-entered unlawfully. And I think, again, there is a distinction here, rather big distinction in my mind between... Okiki says specifically that point, says Okiki's in a better position because he entered lawfully instead of unlawfully. So apparently in Okiki, we said lawful or unlawful re-entry shouldn't matter to whether the clock restarts. Right? Yes. Quote, indeed, Okiki is an a-for-sure application of the Cisneros doctrine, particularly one considers that Okiki's re-entry was lawful and Cisneros was not, yet Cisneros was allowed to qualify for his continuous presence, close quote. I mean, according to Okiki, lawful entry, unlawful, doesn't matter. Yes, and I happen to agree with that particular determination, but I do also acknowledge that in Nelson, it seems to not go in that direction. But however, Nelson finishes off by saying that there is no sound logical justification for attaching such a significance to departure from the country. An alien who leaves for a two-day trip to Canada after committing a crime and lives in the United States for seven years after returning has no greater logical claim to be entitled to cancellation of removal than a similarly situated alien who never leaves the country. Sir, where are you quoting from? This is page 12. It's essentially the very end of Nelson. And the court is very quick to point out that he left for a two-day trip to Canada and states that there's no logical claim to be entitled to cancellation. The word entitled to cancellation, I think, is very important here because in this case, in Petitioner's case, there's every reason in the world to believe that he's entitled to cancellation. Four trips outside the country. Four lawful admissions back into the country through an international airport where he must go through ICE. He must go through the Department of Homeland Security. When you were before the BIA, did you ever raise the question that your client was readmitted upon re-entry? Readmitted upon re-entry? Yes, or admitted upon re-entry. Did you ever raise that question? Yes, sir. You did. Well, legally speaking, it's a fact. I mean, he was readmitted and admitted in the class that he was, which is a permanent resident. He was admitted as a permanent resident four times. They say that it was a substantively unlawful admission. The phrase they use is procedurally regular but substantively unlawful. I find that logic to be extraordinarily flawed, not only because it's a fact that he was admitted through an international airport, but we've all traveled internationally. We know the process that you have to go through. He was, in fact, inspected and admitted. He didn't come across the border by the Peace Bridge. But they say, freely, it was a mistake. He shouldn't have been admitted that way. And in Nelson, we cite to our previous opinion, Gallimore v. Attorney General, which was looking at Section 212C, in which we said, we accept the government's position that a reentry can be substantively unlawful. You can claim to be entering in a class, and then it turns out you were lying about it, and that was actually you were admitted, but it turned out it was substantively unlawful. Why are we bound by that? Well, we're going to hear from you on that. May I answer that question? Go ahead. You are very simple. It was not a mistake. The first travel was with the consent and acquiescence of the United States Department of Probation. He had to ask for their permission. They knew full well what he was. Three subsequent trips, he had petitions pending with the Department of State for his wife and child, and he asked for citizenship. He appeared at the Immigration Office before them, before the same Department of Homeland Security. Okay, gotcha. Thank you. We'll have you back on rebuttal, Mr. Munday. Ms. Murphy. May it please the Court, Lindsay Murphy on behalf of the Attorney General. Your Honors, the agency properly concluded, based on the controlling case law of the Board and of the Circuit, that Mr. Singh's re-entry to the United States in January... Ms. Murphy, make sure you speak clearly enough into that microphone. Yes. The agency properly concluded that Mr. Singh's re-entry to the United States in January of 2003 did not restart the Continuous Presence Clock for purposes of cancellation or removal. The Board has recognized a matter of Nelson that the stop-time rule, that portion of the statute, is ambiguous, and the Board gave us a reading that this Court has later deferred to in Nelson. The Board has said, when an alien departs and re-enters the United States following the commission of a triggering event, the Continuous Residence Clock cannot be restarted, at least in the absence of a waiver of inadmissibility in regard to his conviction. How did N. Ray Nelson, a panel decision from the BIA, purport to limit Cisneros to its facts? Footnote 4 of N. Ray Nelson just kind of kicks Cisneros, an embanked decision, to the curb. What... Just as a legal matter, how does that work? I think the significant facts in Ray Cisneros is that the petitioner, or the alien in that case, had been deported based on a lawful deportation order. And he had been removed to Mexico, and that was that. His proceedings were finished. He came back and turned around and came back to the United States the following day, and he was later issued a new notice to appear. And the Board said, in that situation, where his first set of proceedings had already been completed, they were done. This is a new set of proceedings. This is... What's the logical... What's the policy reason that justifies that? In fact, what's the policy that justifies pinning whether a stop time rule will begin or not begin based on whether somebody leaves the country or not? I'm just having a hard time getting my head around that. Well, I think Madam Nelson clarified for us that really it's not fair to restart the clock based on whether or not an alien has departed and re-entered. And here, Mr. Singh is asserting that he should benefit from a mistake that the government made, admittedly a few times, by letting him in. But he acknowledges that he is inadmissible and he should never have been re-admitted in 2003, 2004, or 2005. And because of the fact that he wasn't admissible, that he did not have a waiver of inadmissibility that would permit him to come back in, the Board reasoned that Congress couldn't have intended the stop time rule to apply to such a situation where, under Congress's view, the petitioner should never have been re-admitted to the United States in the first place. Never mind allowed to restart the clock. In terms of admissibility, as a practical matter, folks at the Board, are they able to detect admissibility in cases like this one? I don't know for sure, Your Honor. I imagine that in most cases, if they have a conviction, that would come up in the check that they do on their computers. But I'm really not sure. Okay. Is this sort of a last clear chance situation? I mean, the government's got the... If the government is doing its job at the border, then a fact situation like this can never arise, right? If the government says, wait, you've committed a crime, you're inadmissible, then we're never faced with the circumstance where somebody gets in and the government has to concede that they came in lawfully, it was perfectly, quote, procedurally regular. But never mind that. The stop time rule means that doesn't count. I mean, should the government be held at all to a responsibility to police the borders and to actually enforce the law there at pain of not being able to make the kind of oxymoronic claim that somebody can come in procedurally regularly and yet be substantively unlawful? I believe I understand your question, Your Honor. My answer would be no. Simply because the inspection officer at the border makes a mistake and admits an alien who is otherwise inadmissible, it shouldn't be deemed to waive the government's right to say that this alien should not be allowed to restart the clock and that this alien is not entitled to relief that Congress never intended him to be eligible for. Do you know if this was because the officer made a mistake or the data was not available? I don't know the answer to that. Would it make a difference? Could it make a difference? It shouldn't make a difference, Your Honor. No, because either way, the fact of the conviction remains. The fact of the petitioner's eligibility ineligible or inadmissibility, excuse me, remains. How are we supposed to try to rationalize or should we try to rationalize this line of case? You'd have to concede, wouldn't you, that there's some tension between Mendoza and Cisneros and then between Cisneros and In re Nelson and then between O'Keeke and our own Nelson decision? I think that there are certainly tension, but these cases, as the board explained in Nelson and as this court agreed in its decision in Nelson, that there are significant factual differences in these cases. So what's the sensible distinction between Cisneros and In re Nelson? I mean, how does a three-member panel of the BIA justify saying that an en banc decision is really, I mean, I could go back and quote it for you, but in essence, they say, yeah, it's sort of, it's limited to its facts. How does that happen? I think it's because of the fact that he was in proceedings before and those proceedings had been terminated and new proceedings had begun again. What's the policy? Can you articulate a policy for us that makes it make sense that if you enter the country illegally after you were deported, you're in a better position than if you enter the country in a quote procedurally regular way. Do you understand what I'm trying to get at? I'm having a difficult time here with the rationale that coming in illegally after you were deported puts you in a better legal position than if you come in lawfully through customs and immigration inspection. Because that's the upshot of Cisneros to In re Nelson, isn't it? In a way, yes. But I think what the board latched on to in distinguishing the two cases is that in Cisneros, DHS could have charged the alien with reinstatement of his prior deportation order, but for some reason didn't. And I think the board might have been confused as to why it didn't. And because it was a completely new set of removal proceedings and the DHS wasn't relying on the old deportation order to say you're not entitled to remain in this country, that the board found that significant. Whereas in this case, the petitioner was never ordered removed as a result of his criminal conviction. He left the country of his own accord and was readmitted, albeit mistakenly. And as for this court's decision in Okeke, the court didn't have the benefit of the board's explanation and analysis in a matter of Nelson. No, it was relying on an in-bank decision, right? It was relying on Cisneros and specifically said in that case, the BIA in deciding Okeke at the administrative level wasn't looking at Cisneros. Now we've got Cisneros. Cisneros distinguishes Mendoza, so we've got to look at Cisneros. And that was the basis for Judge Garth's controlling opinion in that case. I just, I'm just puzzled about how then a panel of the BIA can come up with a decision which cabins Cisneros and then says, in effect, stop time rule, never starts again, forget about it. After Cisneros says the contrary. Well, I think in this case, a matter of Nelson, the board explained that that's a different factual scenario. It relied on ambiguities in the case law. It relied on legislative history cited in Mendoza. And it explains that a situation like this, which is nearly identical to the situation that Mr. Singh is in, an alien is not entitled to have the unlawful, or excuse me, the continuous residence clock restarted when he reenters the country. If the court has no further questions, we'll submit. Thank you. Thank you, Ms. Murphy. And Mr. Monday. I would just like to point out that with respect to the government's position now that this petitioner was mistakenly readmitted four times, it just doesn't, it doesn't make any sense. There's a reason. Why doesn't it make sense? Because that's their job at the border. Well, it may be that you can say that's incompetent and shame on the, on the border inspecting folks. But, but as a legal matter, you don't contend, nor could you really, that he was entering lawfully. He was, as a matter of law, inadmissible at that point based on his conviction, right? I believe that the officers at the border have carte blanche power. They have the power to admit someone after inspection. They have the power to refuse admission. They have the power to nullify congressional enactments. They don't have the power to do that, no. But they do have the power, surprisingly, to expedite removal and declare someone removed without due process before seeing a judge. They have that power. So to say that they didn't, they mistakenly admitted it four times in a row, knowing that he was on federal probation when he got specific permission to do so, it simply defies logic. But, but the other thing that I wanted to point out in conclusion is that there's really practically three ways in which someone gets brought to the attention of DHS in order to be put into removal proceedings. And typically, they're committing a crime, which is something that Nelson did in 2008 to get served with a notice to appear, to apply for future benefits, which is something that Nelson and Okiki did not do, but my client did do. He, in fact, asked for a naturalization on the basis of having been a permanent resident for five years, presented himself, appeared at the immigration office. They knew full well who he was, and they knew what his conviction was. Well, we have very little time here, so just let me ask one, I hope, pointed question. If you were writing this decision, how would you, as a logical matter, given what Nelson says, how would you, or could you, distinguish Nelson and say, well, this case is different? In my opinion, the totality of the circumstances needs to be reviewed, as it should be in other areas of cancellation or removal, such as on the 10-year cancellation or removal, whether or not you can prove extreme hardship, whether or not you can prove good moral character. This is a case-by-case basis. Does it not just make the law a hopelessly ambiguous and arbitrary mess, that the distinction is the general totality of the circumstances and Mr. Singh's good moral character? Absolutely not. I think it's in spirit with the whole reason for it. This is, in fact, a waiver. It's a discretionary humanitarian waiver, as is adjustment of status discretionary, as is 212H, 212C waivers. Cancellation or removal in and of itself is discretionary. That's discretion exercised by the Attorney General, not by a reviewing court on whether or not somebody has met the prerequisites for escaping the stop time rule, right? Well, but I think in the absence of some hard set rule, when you have a fractured court, when you have fractured decisions, conflicting, ambiguous decisions, there has to be a reason for that. And the reason is because no hard set rule makes sense here. It simply doesn't. And the courts and the ambiguity in the decision seems to indicate that, that this is something that needs to be looked at at the administrative level and the determination made, in my opinion. Thank you. Okay, Mr. Monday, thank you very much. We thank both counsel for the job well done. And we'll take the matter under advisement.